on behalf of Appellant GCIU-Employer Retirement Fund. Appellant brings this withdrawal liability action under the Employee Retirement Income Security Act against Coleridge Fine Arts and Jelnecki Limited, two Irish corporations, based on their control group liability.  In 2009, Kansas Corporation Printing Company called Greystone Graphics was established as a result of a merger of two other entities in 1998. At the time of that merger, Coleridge Fine Arts and Jelnecki Limited had a 50% stake in Greystone Graphics. In 2002, Coleridge Fine Arts acquired a 100% stake in Greystone Graphics. Two of the three Greystone board members, Eugene Reynolds and Kevin Walsh, were also owners and directors of Coleridge Fine Arts and Jelnecki Limited. In 2011, Greystone Graphics ceased doing business. A judgment was entered in favor of the plaintiff fund, assessing withdrawal liability in the amount of $4.4 million against Greystone Graphics, its control group members, JDV, Greystone Investment Company, and Coleridge Design. Amendments to ERISA under the MPAA established that withdrawal liability must be paid to a withdrawing employer from a defined benefit pension fund. ERISA defines an employer as not only the entity contributing to the pension plan, but all trades and businesses under common control, including those businesses in a parent-subsidiary relationship. The issue before this Court today comes up on Appellee's motion to dismiss is whether defendant had sufficient minimum contacts with the United States in order to establish specific personal jurisdiction. Specific jurisdiction over a foreign defendant should be exercised if the defendant purposefully directed its activities at the forum and if litigation results from the alleged injuries that arise out of or relate to those activities. If the defendant Is Thomas anywhere down the line? Of course we have interlocking officers and directors. In fact, a significant number of years before they went under. Correct. Mr. Lloyd also testified to myriad telephone conversations they had regularly with Mr. Reynolds and Mr. Walsh. Mr. Reynolds did visit the Kansas Corporation, Greystone Graphics, more frequently than Mr. Walsh did. However, specifically, Mr. Lloyd, again the GM and CFO of Greystone Graphics, stated that Greystone Graphics did not, in fact, pay for the travel of either Walsh or Lloyd. Eugene Reynolds also represented the interests of Coleridge Fine Arts in collective bargaining negotiations in 2007 when he met with representatives of the union and the workers as a representative of Coleridge Fine Arts. Mr. Lloyd, again, provided testimony that on three to four occasions, Coleridge utilized Greystone Graphics to acquire supplies in the United States and send them to Coleridge Fine Arts. And what's your point? My point is this is certainly not alone. We're looking at a cumulative matter here. We have a number of things. And these are another three or four times when Coleridge is utilizing this domestic entity. There's no evidence that they're paying a fee for this service or that it's an arm's length transaction. They're using the domestic entity for which they're 100% owner to acquire supplies and get them to them in Ireland. There's also testimony by both Mr. Lloyd and Mr. Reynolds that in 2002, Coleridge Fine Arts provided a $250,000, quote, loan to Greystone Graphics. Mr. Lloyd testified that he made the request on behalf of Greystone Graphics to Mr. Reynolds. And Mr. Reynolds testified that he approved the loan on behalf of Coleridge Fine Arts. And this was 11 years before Greystone went under? This was, I believe, nine years before Greystone went under. Nine years before they provided this capital so Greystone Graphics could continue operating, as Mr. Reynolds testified that this was a cash requirement in Kansas City and he approved the loan. Now we say loan, there is no evidence of a loan document, there is no evidence from 2002 to 2011, given that this is, you know, nine years, you would think, under a loan, a single payment would have been made under such a loan. No payment, not a dollar was ever made. Well, even if we treat it as an infusion of capital, does that establish minimum contacts nine years later? It is one fact that establishes minimum contact because if we are to believe that these are two, if the argument goes that these are two separate corporate entities acting within themselves as separate entities, then we should look for hallmarks of an arm's-length transaction when they are engaged in business conduct such as this together. Well, isn't the situation a parent-subsidies or subsidiary type of relationship here? And wouldn't you see that kind of give and take and interplay just in that general relationship? I think the point is that Coleridge Fine Arts is so intertwined with the operation of Greystone Graphics and that if we look at all these contacts from the visits to the foreign state on multiple occasions by multiple individuals, their involvement in collective bargaining negotiations, their providing a loan that went unpaid, that over the course of time they have consistently made contacts with the foreign state, not just contacts in the state of Kansas, but contacts with relation to the business operations of Greystone Graphics. And if we take a step back and say, well, we have two board directors in common between these two entities, they're going back and forth, the CFO and GM of Greystone Graphics saying he's not paying for that, Mr. Walsh verifies that Coleridge Fine Arts is paying for that travel and that he's there as a representative of Coleridge Fine Arts. These are all hallmarks of contact, or excuse me, these are all contacts with the foreign state so that they have sufficiently at the state of this case, at the motion to dismiss phase, we can establish that over a period of years, throughout the course of the business, they've consistently been in contact with the foreign state regarding not just attenuated circumstances, but the actual business of Greystone Graphics. And with regard to the... It's comings and goings and, you know, with large lapses of time in between. Don't we need more than that? Your Honor, first, I don't know that there are large lapses in time. Mr. Lloyd testified that Mr. Reynolds visited multiple times per year. Well, but he hadn't visited for quite a while before... Mr. Walsh had not visited, so we have two directors in common that were visiting. So again, cumulatively, we look at two people visiting. Mr. Lloyd testified that he believed Mr. Walsh, and it was less frequent, was approximately five to ten times. He testified that Mr. Reynolds visited multiple times per year. And so if we look at these cumulatively over a period of time, we have sufficient context to show that they were engaged in the foreign state, and that they were engaged in the business, and we are at a state we are at, we are bound to establish that prima facie case. Moreover, the underlying litigation here, with regard to withdrawal liability, directly arises from the operation of the business. So you've got somebody coming over who is an interlocking director with the parent company and the subsidiary. How does that relate to withdrawal liability? Withdrawal liability is a result, a necessary result, from the operation of the business. Greystone Graphics had an ongoing obligation to the pension fund. They made contributions every month to the pension fund from their establishment in 1998 to the time they ceased business in 2011. This action arises directly from that business, directly from that business. The assessment of withdrawal liability is not premised on a speculative tort claim, but contributions to that pension plan at Greystone Graphics. Unfortunately, you have a viable claim against Greystone. You do have a viable claim, given what you've just described, withdrawal liability against Greystone. Correct. We do have a viable claim against Greystone, and under the statutory framework of ERISA, ERISA defines an employer as all trades and businesses associated with one another, and a parent-subsidiary relationship is sufficient to establish withdrawal liability. ERISA defines employer for purposes of ERISA. ERISA does nothing to tell us whether there's personal jurisdiction over a defendant. I agree, Your Honor. I just wanted to make the point that as this case goes forward. Well, why do I care if I'm focused on personal jurisdiction? Thank you. I understand, Your Honor. I appreciate that. So, focused on personal jurisdiction, we have multiple points of conduct throughout the course of years of the foreign corporation reaching in to the foreign state of Kansas and operating a business, maintaining control of that business, and its officers, directors, and owners coming in as representatives of the owner. Well, don't you have to show contacts that are causally connected to the specific trigger for the withdrawal liability? Well, the specific trigger of the withdrawal liability is the operation of the business and the cessation of business. Forever the operation of the business for its entire existence? So long as there's pension fund obligations by the business. Those obligations were met concurrently all along. Everything that happened in the first 10 years of operation when all pension obligations were met, in your view, those contacts are relevant to whether it specifically arises. Yes, because withdrawal liability does not arise until the business withdraws and essentially the business ceases to exist. Withdrawal liability is merely theoretical until the point of withdrawal. It only ripens at the point of withdrawal. Okay, let's talk about how these directors, Reynolds probably specifically, how he would have any connection to withdrawal liability. And I think there was some alleged meeting with an auditor or some financial personnel. Yes, and so I want to highlight that, again, withdrawal liability doesn't ripen until the point of withdrawal. So the connection is with the underlying business and the obligations to the pension fund. Mr. Reynolds had knowledge of pension fund obligations. He actually signed a collective bargaining agreement with Greystone's predecessor, Viles Goeller, who ended up becoming Greystone Graphics. He engaged in collective bargaining negotiations on behalf of Corbett's Fine Arts in 2007. And that is when the discussion of withdrawal liability first arose. And that was because Greystone Graphics was proposing to convert their pension fund into a 401k plan, which they knew would lead to a withdrawal from the fund and they would incur withdrawal liability. So they were requesting, hey, if we do that, how much withdrawal liability are they going to pay? Because they were aware that if they withdrew withdrawal liability. Greystone being they, Greystone was aware, or are you saying that Reynolds was aware? I'm saying that Reynolds was involved in those collective bargaining negotiations on behalf of Corbett's Fine Arts. Right. Reynolds was well aware of the pension fund obligations of Greystone Graphics throughout the course of time. And further, it is not a defense to stand up before a court and say, well, I can't be held to pay withdrawal liability because I wasn't aware of the statutory framework. I didn't know withdrawal liability thing. Ignorance of the law is not a defense here. They were very well aware of the pension fund obligations and withdrawal liability is a necessary result of the withdrawal from the pension fund. But Reynolds was an officer of Greystone at that time, right? He was an officer of both Greystone and Coleridge Fine Arts. So how do we know? I mean, he had a role in those negotiations on behalf of Greystone, right? He had a role in those negotiations. He signed a document that testified that he represented, he spoke to the bargaining committee for the union on behalf of the owner, Coleridge Fine Arts. Isn't he the one that he agreed that he would go to a meeting on behalf of the owners? But there's no evidence the meeting ever took place, right? Well, there's a document saying that they would have a meeting and that the meeting would take place. But the testimony is nobody recalls that the meeting ever took place. And Mr. Lloyd, for his part, specifically testified that he spoke with Mr. Reynolds about collective bargaining negotiations, about withdrawal liability, and had discussions with him and consulted him throughout the course of collective bargaining. And again, I would just say, I don't believe the appellees have argued that they were unaware of the pension fund obligations, that they were unaware of withdrawal liability, and simply because they're- But that's such a general, you know, you know it, so therefore when something happens later, it's basically strict liability. I think you have to have a little closer tie than that, and that's why I was trying to focus you to, I thought what you were alleging, that Reynolds was involved in some type of investigation, what would happen if, you know. That is, more involved in really knowing that this trigger will occur or could occur. And that investigation was made in 2006 in collective bargaining negotiations, and Mr. Lloyd specifically testified that he discussed that withdrawal with Mr. Reynolds related to those collective bargaining negotiations. Okay, and so, and the trigger really happens in what year? The trigger happens in 2011, when Greystone ceases doing business and withdraws. And again, it is Coleridge Fine Arts benefited from the workforce, benefited from Greystone Graphics and their operation in Kansas and in the United States, and a necessary legal result of that is that they also have to be, should be obligated to have the consequences of that interaction with the forum state, which is- You're over your time. Thank you, Your Honor, appreciate it. Could you add two minutes, 30? Okay, we'll just give him two minutes. He'll speak quickly. May it please the Court. Good morning. Robert Hingula with Pulsinelli, representing Coleridge Fine Arts in Jelniki. I do want to point out Kate Gallen at my table also, since she helped with the briefing and with this case on remand. The district court, for the second time, got this case right when it said that jurisdiction didn't exist. For a lot of the same reasons, Judge McHugh, you pointed out in your questioning, is there's no link between the contacts that plaintiffs point out that Coleridge means to the jury, which they may or may not have had with the United States, and the actual withdrawal, which is the damages. That is the link that is missing, and that is the link that is required for jurisdiction to apply. What would we have to see in this record to say that there was a link? And this is, and thank you, Judge Briscoe, and I think this is why the previous panel, when they allowed discovery on day-to-day operations, is that is what's going to have to rise to the level to show that at least near the end of Greystone's existence, that Coleridge was involved in the day-to-day operations to make the decision that it was going to shut down and then withdraw from the fund. So you have to pierce the corporate veil in order to get, to say there's personal jurisdiction? In this case, I do believe so, Judge, or to be able to show that at least that it is directing the operations of it. Because, again, the withdrawal liability, again, the event is in 2011. As soon as it ceased to exist, that is when withdrawal liability occurred. Well, but doesn't it, I mean, if you're looking at causation, basically, that this claim arose out of the conduct, one of the big issues is whether we're looking at for cause, I think your opposing counsel has a good argument here, doesn't he? I don't think so, because the whole idea, as pointed out earlier in this, is that the only causation they have is that Eugene Reynolds, who was a board member and an officer of Greystone, acted and did things on behalf of Greystone in the mid-2000s. So when they talk about the auditor for the withdrawal liability and talking about that, that was in context of a union negotiation of trying to make a decision of whether to go and withdraw from the fund to go into 401K. And that was in 2006? That was in 2006, correct, Your Honor. And then that union negotiation wrapped up and was signed in 2008 by Jim Lloyd. So the whole context of talking withdrawal liability at that point was not what would happen if we had a withdrawal liability because we went bankrupt. It was to go and try to restructure the union negotiation at the time and the collective bargaining agreement to figure out how it would affect the collective bargaining agreement, which it never happened. They didn't withdraw, they didn't go through the 401K, and therefore they went in and signed that agreement in 2008, and that agreement was signed not by Eugene Reynolds but by Jim Lloyd, who was the man, who was the guy who was taking care of the day-to-day operations at Greystone. After 2008, the fund has provided no evidence, has presented no evidence whatsoever, that Eugene Reynolds was involved in any type of operations or any type of discussions that would have led to first the decision to shut down Greystone or lead to the bankruptcy and the decision of that. And in fact, when it came down to the bankruptcy and the shutdown of Greystone, Coleridge wasn't even involved because they didn't purchase any of the equipment, none of the equipment that when Greystone went bankrupt, none of it was transferred over to Ireland. Well, they knew about it. They knew all of this was happening. I mean, you had Reynolds on the board. Sure. I understand, Judge. But again, he was acting on his behalf as an officer of Greystone. There's no evidence here whatsoever that when he was acting as an officer, he was acting out beside. The court, the case law is very clear that officers, the same individual can be an officer in multiple organizations and wear different hats. Right. But, I mean, you say he didn't get the equipment. But the documents, didn't Mr. Reynolds take custody of all the documents when Greystone went bankrupt? The documents were placed, and according to the testimony that was provided, were put through a... Dollar packaging. Yeah, through dollar packaging. Thank you, Judge. Which is a complete different organization, which Mr. Reynolds is a part of. Well, he's the managing director, right? Correct. Correct. He's not just a part of it. But the documents, the decision of where to put them and where to store them was ultimately made by Jim Lloyd, because he was the one to decision to find the caves of where they were going to be. The caves is what I call the place where they keep them. It's caves where it's storage. But it's where they kept those. So although the testimony is that although dollar packaging and Eugene Reynolds may have paid for the storage, the decision of where it was stored, where were they placed, everything else was made by Jim Lloyd. So the question, again, back on here is really what, why the union is focused so much on this withdrawal liability and this automatic liability on a parent and this overscoping of employment. Well, that's obvious. I mean, one's bankrupt and the other's not. Yeah, absolutely. But I think the reason is what they're trying to find here is a shortcut to jurisdiction. Basically saying, look, there's liability on here because they owned this company. They therefore should automatically be liable for no matter what happens with this company. Well, it's not like they had no involvement. I mean, one of their arguments is you had to infuse $250,000 in capital to keep this thing afloat. And it was undercapitalized. And so you're in part responsible for the fact that we got stuck holding the bag when you went under. Well, let me discuss that a little bit. First of all, as the documents and the evidence show, that loan was given in 2000, not 2002. At the time that it was given, Coleridge was only a 50% owner. It was not a 100% owner. It didn't become a 100% owner until 2002. That's when it became a 100% owner. Does that matter? Well, I think giving a loan and the full expectation of coming back doesn't necessarily mean that they are suddenly able to predict that in 11 years they are going to have to shut down a printing company. I mean, if you look at what happened even with the economy and what we've moved from a paper world to a paperless world, from 2008 when Coleridge through Val Golyer bought his first 50% of Greystone until 2011 when it shut down, a lot of things happened. I mean, I can speak to 1997 when I applied to colleges. All my applications were paper. To 2001, half of them were paper, half of them were online, one of them being KU Law, which I went to, and it happened to be one of the only ones online. So now you go to 2011, everybody's doing everything online. And that's what happened. No one could have predicted when they went and engaged, even in 2000 when they lent $250,000, no one could have expected that we'd have a huge recession in 2008 and that we'd become a paperless world so that their printing business would have gone down. Well, what about the meeting that was supposed to be held to discuss the withdrawal obligation? Well, I don't think that meeting, that letter you're talking about between Mr. Reynolds and the union, that does not say, that letter never says that they're supposed to be talking about the withdrawal obligations. All it says is that we will have a meeting that you can express your concerns to the owner and then it also says it's informal, it's off the record. And as Mr. Reynolds also testified, that meeting never even occurred. Well, he says he doesn't recall. He doesn't say didn't occur. Well, at least for these purposes, even looking at the facts most favorable to the plaintiff, there's no evidence whatsoever that it did occur. There's just a letter saying that, okay, we'd be open to listening. Well, that letter is something, isn't it? We're planning a meeting and come on down and the big guy's going to be here and come and tell him what you think. Sure, I understand, Judge, but as this Court, on the last time we were here, has pointed out that that one letter alone is not going to establish sufficient context. And on top of that, can it be linked to the withdrawal that occurred five, six years later? Because that meeting, if you look at the time that that was occurring, was about the actual union negotiations, the negotiations that we had a signed agreement on in 2008 that was signed by, again, Jim Lloyd. So the real purpose, again, on here is, and this is why I think this Court last time talked about the day-to-day operations and why it was so important in order to actually have jurisdiction. Because in order for jurisdiction in this particular case to be shown, you're going to have to show that Coleridge operated or instructed Greystone on a day-to-day basis. I thought we had to show minimum contacts. Minimum contacts, but in this case, I think that minimum contact has to be day-to-day operation in order to show that it is linked to the actual shutting down of Greystone, which is the actual damage that plaintiffs are purporting is based off of. So if you look at this case a lot like Goldfarb and Reimers, in those cases, the parent company had somewhat parental involvement. They would go, in Goldfarb, for example, they went and helped negotiate a loan for the subsidiary. Here we gave a loan, but that funding alone doesn't pierce the corporate veil, doesn't mean that we are now suddenly taking control over that subsidiary. Again, piercing corporate veils is a liability concept. We're trying to talk about jurisdiction. Minimum contacts. Sure. And aren't we just conflating all of this and hasn't, in our prior opinion, didn't we conflate it? I don't think so. I don't think so. Because I think last time we talked about, when we were here last time, when we really talked about minimum contacts, what we're talking about specifically here, the issue that was only brought up was this corporate governance. This whole idea that, okay, you're a parent corporation, and you have a subsidiary, and you have a subsidiary running here, so therefore, all of a sudden, that's enough minimum contacts. Well, let's talk then, if you want to talk about piercing the corporate veil. Mr. Lloyd testified that the full Greystone Board of Directors never met and never kept corporate minutes. That kind of screams out failure to follow corporate formalities pierced the corporate veil to me. Well, I don't think so, Judge, because just because that particular organization may not have kept minutes doesn't mean that it wasn't kept full and separate apart from Coleridge. Well, it's certainly one of the red flags that we look at when we're trying to determine if a subsidiary is really a separate company being operated as a separate company, or whether there really is not total separation between the parent and the subsidiary. But if you look at the day-to-day operations and what was happening, it's Jim Lloyd, who was the person here in Kansas, not here, but in Kansas City, was writing the checks, was making the personnel decisions, was actually running the business, was going and approving expenses, was making sure that machines were repaired and that accounts were fulfilled. He was the one that was making and making sure that the business was going forward. He was getting, at most, advice from a parent, which he's allowed to. And the other point is that he even said himself, and I believe that Mr. Reynolds testified, that Jim Lloyd, who had the power to make all decisions by himself, and he's the one that made decisions. That is what the deposition testimony said. So if he's the one making the decisions and he's the one who's the final go-to, then there's no way that the minimum contacts that has been pointed out by defendant, has been pointed out by plaintiff, I'm sorry, and has been fully analyzed by the district court here, lead to the actual damage of the withdrawal liability. All you have is a parent and a subsidiary. That's all you have. And that's not enough to create jurisdiction under this case. And what I'd like to point out is that to the third factor, even if you find that there's sufficient contacts and that they were linked, you've got to look at whether there is an injustice or a burden on the defendant in order to go and bring a lawsuit here. And the interesting thing about this case is that even if they were to go in, even if liability was clear-cut as they said, they still have to go and take that judgment and still go to Ireland to enforce it. Which bends to the question, why didn't they go take this judgment originally, the Greystone one, and bring it over to Ireland to go and enforce it? Because they have to go there anyway. This is not the end of the road. Again, you're confusing liability with personal jurisdiction. Whether they have to take the judgment to Ireland to enforce it depends upon whether they have personal jurisdiction over these people here. I understand, but I think, Judge, it goes into the after analysis, even if you find the sufficient contacts and that they were linked to the alleged injury in here, you've got to look at those sections as far as what witnesses are, where they're located, what litigation would cause, which we don't concede to liability, obviously, on the other portion. But again, I think the point is here is that the first two steps is not only the question is not only sufficient contacts, but whether those sufficient contacts are linked to, are related to the actual injury, which in this case is when Greystone shut down in 2011 and then therefore withdrew. And there's no evidence, at least up to today, that there was no evidence that between 2007 and 2011 that Coleridge, Mr. Reynolds, anyone did anything that caused the bankruptcy or the shutdown of Greystone, which then led to the liability. And because there's not that joint, that link, that link between that time, jurisdiction cannot be established under specific jurisdiction. If you don't have any other questions, I'm going to stop. Thank you very much. Thank you. Appreciate your time.